Nanette Dembitz, J.
The instant school truancy cases, consolidated because of common issues of law, arose under the clause of section 712 of the Family Court Act that a “ person in need of supervision ” includes a child under 16 “ who does not attend school in accord with the provisions of part one of article sixty-five of the education law ’[1] Other sections of the act authorize the Family Court to order various methods of treatment for “ persons in need of supervision ”. The specified part of the Education Law provides that ‘ ‘ each minor from six to sixteen years of age shall attend upon full time instruction ” “regularly”; “ absence from required attendance shall be permitted only for causes allowed by the general rules and practices of the public schools ” (Education Law of New York, § 3205, .subd. 1, par. a; § 3210, subd. 1, par. a; § 3210, subd. 2, par b; see New York City Board of Education By-Laws, § 90, specifying permitted causes for absence). The truancy provisions and the procedure for enforcing them are attacked in the instant cases in fundamental respects.
Constitutionality oe compulsory education laws
“ There is no doubt as to the power of a State, having a high responsibility for education of its citizens, to impose reasonable regulations for the control and duration of basic education * * * some degree of education is necessary to prepare citizens to participate effectively and intelligently in our open political system. * * * Further, education prepares individuals to be self-reliant and self-sufficient participants in
*341 society.” (Wisconsin v. Yoder, 406 U. S. 205, 213, 221.)[2] Thus, the State’s function as parens patriae to insure the education of children continues to be recognized.[3]
It is argued that coercion or its threat is of little utility in securing school attendance, and that coerced attendance in any event yields no educational benefit. If indeed an exercise of State power is of no benefit to those it purports to aid, the State coercion violates the constitutional guarantee of due process of law. (See Rouse v. Cameron, 373 F. 2d 451, 453; Martarella v. Kelley, 349 F. Supp. 575, 598-600; Wyatt v. Stickney, 344 F. Supp. 387, 390.)
Undoubtedly the best remedy for truancy would be progress towards the ideal of perfecting pedagogy and auxiliary services so that all children would be attracted to school, without coercion. It is clear, even from the court’s limited work with truants, that there is greater room for voluntariness; for some of the pins children whom the court directs to attend its special school with small classes and daily counselling, apparently would do so voluntarily if offered the opportunity. Bureaucratic and budget changes are needed so that such children could transfer to such schools without court intervention.
However, the abandonment of all compulsion in some New York City school districts (see Geduldig, cited n. 2), has afforded no substantiation for the theory that a wholly voluntary attendance program would stimulate and force such improvements in the schools that truancy would decrease. While this important experiment doubtless would have been more successful with greater experience and greater funds for individualized in-school •and out-of-school attention to truants, the Legislature and the court can properly be concerned with immediate measures to prevent irremediable harm from truancy to present-day school children.
*342 Though it is true that the court’s efforts are frequently ineffective with pms-truant children, on the other hand some do accomplish regular and beneficial attendance at their assigned public school or at a court-assigned school as well as at auxiliary facilities such as mental hygiene clinics, when directed ¡by the court to attend and court-admonished that attendance is required by law. Thus, the Legislature can reasonably believe that New York’s compulsory education laws, as applied by this court, aid the class of individuals they are intended to benefit. They therefore are a constitutional exercise of the State’s parens patriae power.[4]
Procedure
(A) Provision for admissibility of attendance transcripts
The Education Law provides; “ A duly certified transcript of the record of attendance and absence of a child * * * shall be accepted as presumptive evidence of the attendance of such child in any proceeding ” (§ 3211, subd. 2). The remainder of the section makes it clear that the transcript is to be prepared from the rollbook kept by the child’s teacher and that the legislative purpose was to relieve classroom teachers from the burden of court appearances, with attendance officers assuming that responsibility instead. In these proceedings, in ¡accord with the usual practice, an attendance officer was the petitioner in this court. The court admitted into evidence, over objections, the transcripts which had been prepared by respondents’ teachers from their rollbooks in the officer’s presence with his check on the accuracy of their transcription, and which had been certified by such teachers as well as the principals of the respective schools.
Respondents’ attorney contends that use of the certified transcripts contradicts the “ best evidence ” rule. However, the Legislature obviously can enact deviations' from common-law or statutory rules respecting admissible evidence. As to the argument that section 3211 has been superseded by section 744 of the Family Court Act, providing for the admission in fact-finding hearings only of “ competent evidence,” it must be noted that section 3211, originally enacted in 1947, was applicable to truancy cases in the predecessor courts to the Family Court (see People v. Pikunas, 260 N. Y. 72, 74, as to the *343 jurisdiction of such courts over truancy). Furthermore, section 3211 was amended in 1962, the year of the establishment of the Family Court, and the court is explicitly mentioned in a related amended section (§ 3232). Thus, on both scores section 3211 must be deemed to have been within the knowledge of the Legislature when it enacted section 744 of the Family Court Act, and the term “ competent ” evidence in that section must be construed to include the evidence specified in section 3211.
(B) Constitutionality of use of transcripts
Because a certified transcript is hearsay, respondents contend that the court’s reliance on it deprives them of the constitutional right to confrontation by the witnesses with personal knowledge of their school absences. However, ‘ ‘ ‘ merely because evidence is admitted in violation of a long-established hearsay rule does not lead to the automatic conclusion that confrontation rights have been denied. ’ ” (Dutton v. Evans, 400 U. S. 74, 82.) The determining criterion is whether (p. 89) there are “ indicia of reliability [of the evidence] though there is no confrontation of the declarant.” Thus, a. conviction for drunken driving, based on a medical examiner’s certificate as to the alcoholic content of defendant’s blood, was affirmed, on the ground that a “ state legislature * * * may carve out a new exception to the hearsay rule, without violating constitutional rights, where * * * the evidence has * * * qualities of reliability and trustworthiness ” (Kay v. United States, 255 F. 2d 476, 480-481).
In this State the highest court upheld against constitutional objection the admission in a manslaughter trial of an autopsy report by an examiner who had died prior to the trial, declaring: “ The right of an accused in a criminal action to be confronted by the witnesses who testify against him, is not violated by the introduction of so-called public documents or official records required to be kept ” (People v. Nisonoff, 293 N. Y. 597, 602).[5] Likewise upheld was the conviction of a traffic violator on the ground that the ‘ ‘ reliability of official entries ” as to his identity *344 was sufficient “ to make out a case prima facie ” (People v. Klepper, 25 N Y 2d 46, 48).
The hearsay exception established by section 3211 is similar to the general and time-honored provision upheld in Nisonoff for the admissibility of a certificate of a public officer “ to a fact ascertained * # * by him in the course of his official duty ” (CPLE 4520). And for like reasons the transcripts here in issue satisfy the criteria for “ underlying reliability and probative value ” (see Richardson v. Perales, 402 U. S. 389, 402). The transcripts are certified by public employees who have neither a personal nor a professional interest in exaggerating the truancy of pupils in the school. As to petitioner attendance officer, his success in his duties of remedying truancy by counselling, referrals, and escorting children to school would reflect better on his professional achievements than filing court petitions. Thus, “ as the records concern public affairs, and do not affect the private interest of the officer, they are not tainted by the suspicion of private advantage.” (Chesapeake & Del. Canal Co. v. United States, 240 F. 903, 907, affd. 250 U. S. 123; see, also, Richardson, supra, p. 403; Long v. United States, 59 F. 2d 602, 603-604; compape White v. Zutell, 263 F. 2d 613, 614-615.) Official documents are therefore deemed trustworthy and admissible though they are prepared in contemplation of litigation, in distinction to ‘ ‘ business records ” which are not generally admissible if so prepared.
Not only are the transcripts reliable, but respondents’ opportunity to confront and cross-examine the teachers who personally observed their nonattendance, would add nothing of evidentiary importance. Obviously it would be humanly impossible for teachers to remember whether respondents were present in their classes on particular dates some months, or even weeks, before the proceedings. Apposite is the comment of the Court of Appeals in upholding the admissibility of an' “ official entry ” as to a traffic violation, in lieu of the declarantarresting policeman’s testimony, “ that a traffic policeman who issues a large number of summonses for routine violations * * * will be hard put to remember the person of an individual operator, especially if there is a contest raised a considerable time after the summons is issued.” (People v. Klepper, 25 N Y 2d 46, 47.) Similarly addressing itself to the admission of reports— thereby physicians whose duties entailed their filing many such reports — another court pointed out: “ Their testimony when produced is ordinarily a mere recital of what is contained in their reports, to which they must look for the *345 purpose of refreshing the memory; and every one with experience in conducting litigation knows that as a matter of fact such reports are more reliable than the memory of the witnesses who made them ” (Long v. United States, 59 F. 2d 602, 603-604).
"While it is thus apparent that written reports of school absences are more reliable and appropriate than testimony, respondents contend that the rollbook in which the attendance is first recorded should be produced in court. For the reasons discussed above, school absences would not deliberately be overstated in the transcript. At most, a few inadvertent errors in compilation from the rollbook are a possibility; there is no likelihood that the 90 to 130 unexcused absences shown in each of the cases at bar (typical of the. number to have accumulated before truancy cases are brought in New York City) represent erroneous transcriptions.
"While a transcript is entitled to slightly less credence than a rollbook, the legislative judgment that the former should be used instead of the latter cannot be deemed irrational. Production of the rollbook in court obviously might impede the ongoing transaction of the school’s affairs, or force upon the school the complexity and expense of duplicating records, or invade the privacy of other pupils whose names appear on the same rollbook page, etc.
Since there is no likelihood of a significant degree of unreliability of the transcript, and since the cross-examination of the original declarant teacher and transcriber would add nothing to the reliability of the evidence, section 3211 is constitutional. Absent refutation, the probative value of the transcript is sufficient to constitute proof beyond a reasonable doubt. In these cases, respondents rested after the admissions of the transcripts.
(C) Proof of factors in truancy
The court sustained objections to respondents’ attorney’s cross-examination of petitioner attendance officers with respect to the extent of psychological counselling offered respondents prior to the filing of the petitions, and with respect to the suitability of their assigned schools.[6]
Pins petitions usually are filed against truant children only when continued remedial efforts outside of court seem destined *346 for failure — when the child has rejected counselling, changes in class assignments, referrals to mental hygiene clinics, or the like. Certainly voluntary remedies should be attempted prior to court intervention. However, consideration of attempts to overcome a child’s truancy is inappropriate in the fact-finding hearing (see Family Ct. Act, § 742) —that is, prior to a determination of the truth of the allegation that he has had unexcused school absences. Review of factors bearing on the truancy is also unfeasible in the fact-finding hearing, in which only “ competent ” evidence is admissible; for a wide range of inadmissible hearsay testimony usually is relevant to an appraisal of available classes, schools, and treatment and their advantages and disadvantages for a child of respondent’s aptitudes. However, all circumstances relevant to the cause and cure of a respondent’s truancy should be considered in the dispositional phase of the proceeding after the fact finding (Family Ct. Act, §§ 743, 745). If it then appears that respondent is not in need of court supervision or treatment (but would attend school voluntarily if, for example, his class or school were changed or he received counselling), the petition should be dismissed. A refusal to so dismiss and a conclusory finding of pins would be reversible for arbitrariness.
Motions to dismiss petitions are denied.

. Section 3232 of the Education Law also provides for Family Court jurisdiction over violations of Part I of article 65.

. (See, also, Zorach v. Clauson, 343 U. S. 306, 324; Pierce v. Society of Sisters, 268 U. S. 510, 534; People v. Ekerold, 211 N. Y. 386, 391, 393; Matter of Miller, 12 A D 2d 890; Ackley v. Board of Educ. of City of N. Y., 174 App. Div. 44, 47.)
For recent New York pronouncement, see Matter of Geduldig v. Board of Educ. of City of N. Y. (43 A D 2d 840, 841) holding that a community school board had exceeded its powers by dismissing all the attendance teachers for its area, thus precluding enforcement of “the public policy of the State which mandates compulsory education of minors between the ages of 6 and 16 years.”

. With respect to the goal of preparing children to become self-sufficient adults, it appears that the correlation between school truancy and juvenile delinquency is high, as is the correlation between delinquency and adult criminality. (See President’s Commission on Law Enforcement, Challenge of Crime in a Free Society [1967], eh. 3.)

. While the argument of unconstitutional vagueness is urged with respect to some of the Family Court Act’s definitions of a “ person in need of supervision” (but, compare, Smith v. Goguen, 415 U. S. 566, the truancy provision is clear and specific.) (See People v. Pikunas, 260 N. Y. 72.)

. In general, deviations, from the rule against hearsay permitted in civil cases either at common law or by statute, are likewise permissible in criminal cases. (See People v. Kohlmeyer, 284 N. Y. 366; People v. Lederle, 206 Misc. 244, affd. 285 App. Div. 974, affd. 309 N. Y. 866; People v. Richardson, 38 A D 2d 990; People v. Fields, 74 Misc 2d 109, 111; People v. Preston, 13 Misc 2d 802; Gilstrap v. United States, 389 F. 2d 6, 10.)
“It is exceedingly rare for the common law to make admissibility'of evidence turn on whether the proceeding is civil or criminal in nature.” (Dutton v. Evans, 400 U. S. 74, 97, n. 4, Harlan, J., concurring.)

. Cf. People v. Barkman (34 N Y 2d 624, 625), indicating that it would be inappropriate herein to consider siich issues of justification for truancy for “ defense counsel had been speaking only in the broadest, most general terms. At no time was there any tender of proof as to exact conditions on the basis of which the asserted defense of justification would be predicated.”